UNITED STATES DISTRICT COURT                    FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
RACKY RAMCHAIR,                                          MEMORANDUM
                                                          AND ORDER
                        Petitioner,                     04 CV 4241 (JG)

            - against -

JAMES CONWAY, Superintendent,
Attica Correctional Facility,

                        Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


A P P E A R A N C E S :

            FRANK HANDELMAN. ESQ.
                  Three New York Plaza
                  New York, New York 10004
                  Attorney for Petitioner

            ELIOT SPITZER
                  Attorney General
                  State of New York
                  120 Broadway
                  New York, New York 10271-0332
            By:   Danielle Attias
                  Assistant Attorney General
                  Attorneys for Respondent


JOHN GLEESON, United States District Judge:

            Petitioner Racky Ramchair seeks habeas corpus relief from his state court

convictions of robbery in the first and second degrees.  I held oral argument on August 5, 2005.

For the reasons set forth below, the two claims raised by Ramchair in his initial *pro se* petition do

not appear to warrant habeas relief.  Another claim, advanced by counsel I have appointed for

Ramchair, appears to have considerable merit.  That claim -- ineffective assistance of appellate

counsel -- is neither exhausted nor procedurally defaulted, and I am therefore precluded from granting relief on that ground until the state courts have had an opportunity to consider it. Accordingly, the petition is held in abeyance pending Ramchair's exhaustion of the claim in state court.

BACKGROUND

A.     The Crime and the Identification of Ramchair

The evidence at trial established that on April 30, 1995, at about 11:30 p.m., Austin Olek was robbed at gunpoint by two men who were passengers in Olek's cab.  One was black and the other -- who Olek later identified as Ramchair -- was Guyanese.  Olek had picked up the two men near a subway station in Queens.  After driving for about fifteen minutes, the black man, who was sitting directly behind Olek, wrapped his arm around Olek's neck, put a gun to his head, and threatened to "blow his head off."  (Tr. at 256.)[1]  The Guyanese man took the $40 that was in Olek's hand, climbed into the driver's seat, and put the car into drive.  Olek struggled, extricated himself from the cab, and telephoned the police.

Two or three days after the robbery, Olek met with Detective Robert Winnik. Olek described the person who took the $40 from him as a Guyanese Indian with short hair who stood five feet, ten inches tall, weighing around 165 pounds.  (Tr. at 312-13.)  When asked why he believed the robber was Guyanese, Olek testified that the robber told him he was Guyanese, and that he "look[ed] like a Guyanese."  (Tr. at 276.)  Indeed, Olek described the fact that the

---

[1]        "Tr." is used here to refer to the pages of the trial at which Ramchair was convicted, which, as discussed below, was his third trial.  The record submitted to me contains, in two volumes containing sequentially numbered pages, excerpts from the second trial as well.  To reduce confusion, citations to the second trial will be in the form "Tr. Trial II at __."  "H. __" refers to the pages of the transcript of the suppressing hearing.

2

robber was a Guyanese Indian as "an important characteristic" to him.  (Tr. 319-20.)[2]

On June 15, 1995, approximately seven weeks after the robbery, Olek met Detective Winnik at the 109th Precinct in Flushing to view a line-up containing Ramchair and five "fillers." (Tr. 333.)  Pursuant to state law, counsel was appointed for Ramchair and was present at the line-up.  The attorney was Jonathan T. Latimer, III, Esq.

Whereas Ramchair had facial hair (sideburns and beard), at least two of the fillers did not.[3]  So prior to conducting the line-up, Winnik gave them carbon paper to rub on their faces.  (Tr. at 334.)  The "carbon rub" was meant to "put a little more of what appeared to be hair on their faces." (Tr. at 368.)  All the fillers wore baseball caps turned around in an attempt to minimize differences in hair color or quantity.  (Tr. at 335.)  Olek identified Ramchair from the line-up as one of the persons who robbed him.  (Tr. at 338.)  Ramchair was charged with robbery in the first and second degrees.

B.     The Suppression Hearing

Latimer continued his representation of Ramchair after he was charged.  He moved to suppress Olek's identification of Ramchair on the ground that the line-up was unnecessarily suggestive.  Olek had described the perpetrator as Guyanese Indian, and counsel argued that Ramchair was the only person in the line-up who fit that description.  (H. 47-48.)  For her part, the prosecutor argued that appearance was what mattered, not national origin, and the

---

[2]     There was evidence that Olek was himself Guyanese.  (H. 34.)

[3]     At the suppression hearing, Winnik could not remember how many of the fillers lacked facial hair. (H. 41.)  At the third trial, he said it was "a couple." (Tr. at 335.)

3

fillers in the line-up were sufficiently similar to Ramchair in skin tone.  (H. 49-50.)[4]

Detective Winnik testified that defense counsel for Ramchair was present at the line-up.  (H. 20-40.)  The prosecutor did *not* ask Winnik whether Latimer objected to the line-up procedures or to the composition of the line-up at the time.

The motion to suppress was denied.

C.     The First Trial

During his first trial, Ramchair was assaulted in jail.  As a result of the assault, he was unable to assist in his defense.  He moved for a mistrial, and the motion was granted on May 29, 1996.  Although it is not clear from the record before me, which does not include the transcript of the first trial, the mistrial apparently occurred before Detective Winnik testified about the line-up.  In any event, there was no testimony that Latimer had not objected to the line-up.

D.     The Second Trial

1.     The Identification Issue

Ramchair's second trial was before Justice Joseph Golia and a jury.  The defense was that Olek made a tainted identification.  Specifically, Latimer contended that Olek had identified the person who took his money as a Guyanese Indian, and the line-up was unfair because Ramchair was the only one in it who fit that description.  (*See* Tr. Trial II at 54.)  When Detective Winnik testified about the line-up, his testimony essentially echoed the testimony he

---

[4]     The hearing court precluded questioning of Winnik as to whether the fillers were Guyanese.  (H. 44-45.)  At trial, the evidence revealed as follows about the line-up in which Ramchair was number five:  Number one was of uncertain ethnicity, but his skin complexion was dramatically darker than everyone else; Numbers two, three and six were Hispanic, and Number four was African-American.  (*See* Tr. 359-60, 514).

4

gave at the suppression hearing.  He recalled that an attorney was present for Ramchair, but he

could not recall who the attorney was.  (Tr. Trial II at 33.)  Once again, the prosecutor did *not*

elicit testimony from Winnik that counsel did not object to the line-up procedure or composition.

    2.   <u>The Mistrial</u>

On June 12, 1996, after jury deliberations had begun, one of the jurors complained

of chest pains.  The court suspended deliberations and the juror was escorted to the hospital.

After being informed that the juror may have suffered a heart attack and was admitted to the

hospital for at least two days, the court asked defense counsel whether Ramchair would consent

to proceed with eleven jurors.  Ramchair did not so consent.  Defense counsel requested that

before granting a mistrial, "the Court gather more information about the health and well-being of

the juror."  The Court denied the request, stating:

> I have just spoken to my officers, they just came back.  We
> checked with the hospital, the woman is being admitted with chest
> pains, numbness of the left arm and other symptoms reflective of a
> heart attack.  We thought maybe it was something else.  We
> thought maybe it was gallbladder.  Those are the two similar most
> pains in the body.  Went back to the hospital, doctor admitted her,
> said she should have come in sooner. She is staying there tonight.
> She is admitted to the hospital for at least two more days in the
> hospital.  Two more days, this being Wednesday, gives you
> Thursday, Friday.  Your client is a Muslim, you can't even have a
> Friday.

(Attias Decl. Ex. B, June 12, 1996 Tr. at 3.)  The court declared a mistrial over defense counsel's

objections.

By motion papers dated July 9, 1996, Ramchair moved to dismiss the indictment

on the ground that a third trial would place him in double jeopardy.  By Decision and Order dated

August 13, 1996, Justice Golia denied the motion.  The court stated that while jeopardy had

attached, " I obtained enough information regarding the juror's condition to determine that a mistrial was clearly necessary in this instance and no possible alternatives existed." (Attias Decl. Ex. E, Order Denying Motion to Dismiss, at 4.)

E.     The Third Trial

When the case was tried for the third time, it was once again clear that the focal point of the trial would be Olek's identification of Ramchair.  As Latimer stated in his opening remarks:

> Now, the prosecution in her opening just went through identification a number of times and that is because that is the main issue here.  ...
>
> We're firmly convinced that the evidence will show that on April 30th of 1995 Austin Olek was robbed by two individuals of some property and of his vehicle and no one is contesting or denying that.  The identification of the individual who committed this crime however is the telling factor, is the important factor, is the issue which we're asking you to decide, because it is our contention that Racky Ramchair is not the individual who committed this crime.  ...
>
> You will see Mr. Ramchair does not fit the description of the individual in a number of ways.  In fact, the evidence will show you that the only thing Mr. Olek had with respect to the individual who committed the crime is he is Guyanese.  And that is, in effect, why he was picked out on that line-up on June 15, 1995 and that is why he is here.

(Tr. 249-50.)

Olek had described the person who took the $40 from him as a Guyanese Indian, and had identified that trait as an "important characteristic" to Olek.  (Tr. at 320.)  When Latimer asked Olek whether he saw any other Guyanese Indians in the line-up, the trial court sustained the prosecutor's objection.  (Tr. at 318-19.)  Nevertheless, Latimer made clear his challenge to the identification procedure:  Olek went to the line-up looking for someone who fit the

6

description he had given to the police, and of the participants in the line-up, only Ramchair had

the principal characteristic -- Guyanese Indian -- Olek had provided.  (Tr. 316-20.)

After Olek testified, Detective Winnik once again testified about the line-up

identification of Ramchair by Olek.  However, this time Winnik's testimony contained two

critical additions.  First, whereas in the previous trial he could not recall who represented

Ramchair at the line-up, Winnik now identified Latimer, Ramchair's trial counsel, as the

attorney:

| | |
|---|---|
| [ADA] Leopold: | Now, was the defendant's attorney present for this line-up? |
| Det. Winnik: | Yes, he was. |
| Ms. Leopold: | And do you recall who that attorney was? |
| Det. Winnik: | I'm not sure of his name, but I believe it was this gentleman [referring to Latimer]. |

(Tr. 336.)

Second, having placed Latimer at the line-up, the prosecutor -- for the first time in

the long history of the case -- sought to place Latimer's stamp of approval on the hotly

challenged identification procedure:

| | |
|---|---|
| Ms. Leopold: | Detective, when you had put together the line-up and you had the fillers in place with the subject, with the defendant in this case, did this attorney, Mr. Latimer, make any objections? |
| Mr. Latimer: | Objection to making me a witness, Judge. |
| The Court: | Objection overruled. |
| Ms. Leopold: | Were there any objections raised by this attorney as to the way that you put together the line-up? |

7

Det. Winnik:  No there were not.

                . . .

Ms. Leopold:  Had there been an objection raised, would you have considered making any changes?

Det. Winnik:  Yes, I would have either considered the change or I would have noted the objection.

Ms. Leopold:  But there were none in this case?

Det. Winnik:  No there was not.

(Tr. 336-37.)

Outside of the presence of the jury, the following colloquy took place:

Mr. Latimer:  Your Honor, I objected at the time when the People asked the witness whether or not I was present and whether or not I leveled any objections with respect to this particular line-up.  I think that is completely and totally improper, because now it puts me in a position of being a witness at this particular trial.  It puts me in a position of becoming a witness at this particular trial, number one, whether or not I thought the line-up was fair, and, number two, if I did not think the line-up was fair, why did I not raise any objections, and, number three, to dispute the officer's contentions I did, in fact, raise any objections had not been made an issue by the People with respect to that particular testimony.  And I don't see any other way to deal with it, but to have me testify. . . .  I am not conceding that I made no objections at this point, but, number two, if the jury were to believe that I did not make any objections, there are a myriad of reasons that I can have which if I were to be called a witness, I am certainly glad to be called for the court and this jury to note why they would not be noted at a line-up or why I would not state them.

The Court:  It seems to me that the defense attorney was aware before today whether he was going to raise objections to the conduct of the line-up and as to the improprieties which he may have observed when he was there.  Being aware of the necessity to state those on the record what was improper

about it, it seems to me you should have been relieved as an attorney before you started this trial.

. . .

Mr. Latimer:   I have no intention about testifying about the line-up.  I am willing to allow the officer's testimony to stand as to what occurred with respect to the line-up and the fillers.  What she's now trying to do is imply to this jury that my opinion personally was that it is fair, and that is totally improper.

The Court:   Your opinion is not relevant, you should have me –

Mr. Latimer:   How am I suppose to whether (sic) or not I raise objections?

The Court:   If you have legal objections and the jury is entitled to know whether any such objections were raised at the time of the line-up.

Mr. Latimer:   Judge – May I –

The Court:   Whatever your application is, it's denied.

Mr. Latimer:   I want to testify and tell the jury as to what objections were raised and why I didn't raise certain other ones.

The Court:   Application denied.  You're aware of the necessity to do this before the trial began.

Mr. Latimer:   There's no necessity to do that, Judge.  My opinion should not be an issue.  I should not be –

The Court:   Your presence was an issue.

Mr. Latimer:   An attorney is present at every line-up where an order to show cause is, Judge.  You cannot have the prosecution apply an attorney's personal opinion or impression or his professional determination as to what he should or shouldn't do –

The Court:   There was no comment made as to what your opinion may have been.

(Tr. 343-46.)

9

On cross-examination, Latimer questioned Winnik about whether Latimer had objected to the fillers.  Winnik testified that Latimer had not objected, and that he would have noted any objections on the back of the line-up sheet.  (Tr. 362-367.)

On redirect examination, the prosecutor again suggested that Latimer's failure to object implied that Latimer believed the line-up was fair:

| Ms. Leopold: | [A]s far as this lineup goes, is it a fact that this defense attorney did not object to the fillers that were used; isn't that correct? |
|---|---|
| Mr. Latimer: | Objection, your Honor.  I am going to ask to testify. |
| The Court: | That is precisely within the scope of your cross-examination at this point. |
| Mr. Latimer: | But, Judge, you're not letting me testify as a witness. |
| The Court: | That is correct, because of the record of this case.  We have put that on the record.  Don't say it again.  There are very good legal reasons for my ruling. |
| Ms. Leopold: | Once again, I would ask you, Detective, whether or not as far as this lineup was concerned, when this attorney was present, did he object to any of the fillers that you had put in that lineup? |
| Mr. Latimer: | Objection.  You're allowing that going in uncontradicted and that's not fair. |
| The Court: | Say it again and we will have business together at the end of the trial.<br>. . . |
| Ms. Leopold: | As far as this lineup was put together, when you were present at the lineup and this defense attorney was present at the lineup, did he ever, in any way, shape or manner or form, object to any of the fillers that you had in this lineup? |
| Det. Winnik: | No, he did not. |

10

. . .

Ms. Leopold:  Did he object to the specific people that you had chosen as fillers?

Det. Winnik:  No, he didn't.

Ms. Leopold:  Did he object on the basis their nationality was not necessarily the same as that of the defendant?

Det. Winnik:  No.

(Tr. 371-73.)

After Winnik's testimony, Latimer moved for a mistrial: "I have a motion for a mistrial. I think it is completely improper to allow the prosecution to imply through their questioning of this witness that I somehow condoned the line-up and contend that is fair and then not allow me to testify myself or to put on that information in the contrary with respect to that issue." (Tr. 380-81.) The trial court denied the motion. (Tr. 381.)

Latimer began his summation by reminding the jury that the main issue in the case was Olek's identification of Ramchair. Addressing the line-up, he argued that it "was blatantly unfair." (Tr. 511.) He ridiculed the use of carbon paper to try to make the facial hair of the fillers look similar to Ramchair's facial hair. (Tr. 510.) He criticized the fact that after Olek described the perpetrator as appearing to be Guyanese Indian (*see* Tr. 275-76, 317), the line-up fillers were a black American, three Hispanics and a dark-skinned person of uncertain ethnicity. (Tr. 513.) Latimer also criticized the use of "carbon rubs" to simulate facial hair, asserting that they made the fillers appear to have "shmutz" on their faces. (Tr. 512.) Analogizing Olek's in-court identification of Ramchair to the stationhouse line-up, counsel argued:

You know what [the line-up] kind of reminds me of? When Mr.

11

> Olek sat up here in court and he is asked to point out, do you see
> the individual who was that perpetrator in the crime and me and
> Mr. Ramchair are sitting over here at the table and Mr. Olek says
> yes, it's him, it's the guy over there.  Who else is he going to pick?
> Kind of reminds me of the lineup, doesn't it?  You got Mr.
> Ramchair, you got me, the black American guy, throw in a couple
> of more Latinos, you got that great fair line-up all over again.

(Tr. 514.)[5]

In response, the prosecutor once again used Latimer's inaction at the line-up to

rebut Latimer's own argument:  "Well, defense counsel got into an area of argument as far as this

line-up is concerned.  First of all, [bear] in mind that he was present for this line-up.  Okay.

Present."  (Tr. 546.)

The prosecutor then lashed into Latimer, accusing him of racism:

| | |
|---|---|
| Ms. Leopold: | But he made to you what I suggest to you is a really racist kind of an argument and here's how it goes. Mr. Olek only picked this defendant out of the lineup because he is Guyanese.  Okay?  That's the reason why he picked him out.  Not because he, God forbid, recognized him.  No, no, he picked him out because he was Guyanese.  Do you know what that's like saying, ladies and gentlemen.  As offensive as it may sound. |
| Mr. Latimer: | Objection. |
| Ms. Leopold: | That's like saying -- |
| The Court: | Sustained. |
| Ms. Leopold: | Ladies and gentlemen, that is like saying all black people look alike, all Hispanic people look alike, all |

---

[5]        A photograph of the line-up was received in evidence at trial.  It was the *only* exhibit at trial, reflecting the significance of the line-up in the case.  A copy of the photograph was provided to me, and it is attached hereto.  Its size and the angle from which it was taken diminishes its usefulness in assessing Latimer's claim of suggestiveness.  Ramchair is number five in the line-up.

|              | Guyanese people look alike.  That's what he is saying. |
| Mr. Latimer: | Objection. |
| The Court:   | Objection sustained.  The court did not understand that to be the argument defense counsel raised. |
| Ms. Leopold: | He wants you to believe he only picked him out because he was Guyanese.  What is that saying?  The man can't tell one Guyanese from the next?  What other argument is there?  That is the argument.  And that, ladies and gentlemen, is insulting. |
| Mr. Latimer: | Objection. |
| The Court:   | Objection sustained. |

(Tr. 546-47.)

F.      What Latimer's Testimony Would Have Been

 Before moving for a mistrial, Latimer asked permission to testify, which was denied.  Though Latimer made it clear that his testimony would explain to a jury why defense counsel might stay silent even during an unfair line-up (*see* Tr. 343-46), the trial record did not contain a full offer of proof as to what his testimony would have been.  I therefore directed that he supply that information in connection with this petition.  He did so in an affidavit submitted on September 9, 2005.

 Latimer would have testified that he had more than 10 years' experience defending criminal cases, and that he had attended many line-ups as counsel for the "subject." Counsel in those situations serves only as an observer, not as a participant in the identification procedure.  Latimer had no role in the selection of the fillers for Ramchair's line-up.  He believed that the use of fillers who had racial and physical differences as compared to Ramchair was

13

objectionable, and that the use of carbon paper to mask some of the physical differences was objectionable as well.

Though Latimer could not recall in September 2005 whether he voiced objections at the line-up ten years earlier, he would have testified to important reasons why such objections would *not* be voiced.  Specifically, in his experience, objecting to an unfair line-up produces only a superficial change that does not eradicate the unfairness, but then the "police have put themselves in the position to assert that defense counsel was consulted and assisted in the same line-up procedure that is later challenged as unfair."  (Latimer Aff., ¶ 23.)  For that reason and others, Latimer would have testified that "a defendant's interest is best served when the police action at a line-up is put before the trier of fact and the position of the defense, as to the fairness of the line-up, is the sole province of the defense."  (*Id.* at ¶ 26.)

G.    Procedural History

Ramchair was convicted of robbery in the first and second degrees.  He was sentenced to concurrent terms of imprisonment of 10 to 20 years on the first degree conviction and 5 to 10 years on the second degree conviction.  Ramchair appealed to the Appellate Division, Second Department.  He was represented by new counsel on appeal.  For reasons that do not appear in the record, it took appellate counsel five years, until May 2002, to perfect the appeal.

Appellate counsel argued that (1) Ramchair's third trial violated his right not to be placed in double jeopardy because the trial court at Ramchair's second trial erroneously declared a mistrial over defense counsel's objection in the absence of "manifest necessity"; and (2) Ramchair was deprived of due process because the trial court, after allowing the prosecutor to elicit testimony that Latimer had not objected to the line-up, precluded Latimer from testifying at

14

trial.  Notably, appellate counsel did not contend that the trial court erred by failing to grant

Latimer's motion for a mistrial.

   The Appellate Division rejected Ramchair's challenges, and affirmed his

conviction.  *People v. Ramchair*, 308 A.D.2d 601 (2d Dep't 2003).  The court found that the trial

court had properly declared a mistrial:

> [A]t the time the juror was hospitalized, the trial court had already
> dismissed the alternate jurors and sequestered the jury.  The jury
> had actually begun deliberating the day before the hospitalization,
> spent one night in a hotel, and had returned for deliberations the
> following day, when the juror began complaining of chest pains
> and numbness in her left arm.  She was subsequently admitted into
> the hospital for an indeterminate period of time, and diagnosed as
> possibly having suffered a heart attack.  Under these
> circumstances, it was proper for the trial court to declare a mistrial
> over the defendant's objection.

308 A.D.2d at 602.  The court also found that the trial court had properly precluded defense

counsel from testifying:

> The defense counsel sought to testify to rebut the detective's
> statement that he did not raise any objections at the lineup when
> the complainant identified the defendant.  However, since the
> defense counsel never requested to withdraw as the defendant's
> attorney so that he could be the defendant's witness, it was proper
> for the trial court to preclude his testimony.

*Id.*  The Court of Appeals denied Ramchair's application for leave to appeal on December 22,

2003.  *People v. Ramchair*, 1 N.Y.3d 578 (2003) (Smith, J.).

   On September 20, 2004, Ramchair filed the instant petition for a writ of habeas

corpus asserting the same two claims that he had asserted on direct review.  Upon my review of

the *pro se* petition, I determined on April 1, 2005, that counsel ought to be appointed.  Frank

Handelman, Esq., was appointed and oral argument was held on August 5, 2005.

DISCUSSION

A.      The Standard of Review

        The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed

the scope of federal habeas review of state convictions where the state court has adjudicated a

petitioner's federal claim on the merits.  *See* 28 U.S.C. § 2254(d).  Under the AEDPA standard,

which applies to habeas petitions filed after AEDPA's enactment in 1996, the reviewing court

may grant habeas relief only if the state court's decision "was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States."  28 U.S.C. § 2254(d)(1).  The Supreme Court has interpreted the phrase

"clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme

Court's] decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529

U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001).

        A decision is "contrary to" clearly established federal law, as determined by the

Supreme Court, if "the state court arrives at a conclusion opposite to that reached by [the

Supreme Court] on a question of law or if the state court decides a case differently than [the

Supreme Court] has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 413.  A

decision is an "unreasonable application" of clearly established Supreme Court law if a state

court "identifies the correct governing legal principle from [the Supreme Court's] decisions but

unreasonably applies that principle to the facts of [a] prisoner's case."  *Id.*  "In other words, a

federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a

set of facts different from those of the case in which the principle was announced.'"  *Wiggins v.

Smith*, 539 U.S. 510, 520 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

16

Under AEDPA's deferential standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Gilchrist*, 260 F.3d at 93 (quoting *Williams*, 529 U.S. at 411); *see also Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam) ("Where . . . the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable.").  Interpreting *Williams*, however, the Second Circuit has added that although "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

AEDPA's deferential standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether it has alluded to federal law in its decision.  As the Second Circuit stated in *Sellan v. Kuhlman*:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment.  When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

261 F.3d 303, 312 (2d Cir. 2001).  However, if a federal claim has not been adjudicated on the merits, AEDPA deference is not required.  *DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005) (citing *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003).

Here, both claims in Ramchair's *pro se* petition were adjudicated on the merits in

state court, and therefore AEDPA deference applies.

B.      Exhaustion

Before a federal court may grant a petition on a particular ground, the petitioner must have exhausted all available state judicial remedies.  28 U.S.C. § 2254(b); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  In order to exhaust his state remedies, a petitioner must have fairly presented his federal constitutional claims to the highest state court.  *Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).  A petitioner has fairly presented a claim if he or she apprised the state courts of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court."  *Id*.  Even if a petitioner raises precisely the same legal claims in state and federal proceedings, reliance in the two proceedings upon different factual grounds that fundamentally alter the legal claim will foreclose a conclusion that the claim is exhausted.  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *see also Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir. 2003) ("A petitioner has 'fairly presented' his claim only if he has informed the state court of both the factual and the legal premises of the claim he asserts in federal court." (quotation marks omitted)).  In other words, the claim presented to the state court "must be the substantial equivalent of the claim raised in the federal habeas petition."  *Id*. at 295 (quotation marks omitted).  Furthermore, "the basic requirement remains that 'the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature.'"  *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (quoting *Daye*, 696 F.2d at 192).

When a habeas petitioner defaults his federal claim in state court, and thereby no longer has any state remedies available to him, such a claim is deemed exhausted even though the state courts have had no opportunity previously to consider it.  A federal court need not

require that a federal claim be presented to a state court if the state court would hold the claim to

be procedurally barred.  *Grey v. Hoke*, 933 F.2d 117 (2d Cir. 1991) (citing *Harris v. Reed*, 489

U.S. 255, 263 n.9 (1989)).

        Because a state procedural bar represents an adequate and independent state

ground for deciding the claim against the petitioner, however, a federal habeas court may review

a procedurally barred claim on the merits only if the petitioner demonstrates cause for the default

and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure

to consider the claim will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at

750.

        In New York, the procedural vehicle for claims of ineffective assistance of

appellate counsel is a motion for a writ of error coram nobis addressed to the Supreme Court,

Appellate Division.  *See People v. Bachert*, 69 N.Y.2d 593 (1987).  There is no time limit for the

filing of such a motion, *see Smith v. Duncan*, 411 F.3d 340, 348 n.6 (2d Cir. 2005), and both

counsel in this case agree that Ramchair has that opportunity for relief available to him in the

New York courts.

C.     <u>Ramchair's Claims</u>

    1.    <u>Double Jeopardy</u>

        Ramchair asserts that his third trial violated his rights under the Double Jeopardy

Clause because the trial court improperly declared a mistrial in his second trial.  The right to have

a trial completed by the jury selected for that purpose is one of a defendant's valued rights.  *See*

*Dunkerley v. Hogan*, 579 F.2d 141, 145 (2d Cir. 1978).  Ramchair asserts that the court did not

have sufficient information concerning the juror's condition to deprive him of that right, and that

the court should have continued the trial to see whether the ill juror could in fact return and continue with deliberations.

A state may not place a defendant twice in jeopardy for the same offense. *Arizona v. Washington*, 434 U.S. 497, 503 (1978). Although jeopardy attaches when a jury is sworn, a retrial is not automatically barred when a criminal proceeding is terminated without a resolution on the merits. *Id.* at 504-05. However, where a mistrial is declared over the objection of a defendant, "manifest necessity" for the mistrial -- meaning a "high degree" of necessity -- must be demonstrated. *Id.* at 505. The types of situations that constitute "manifest necessity" are too varied to be captured by a precise formula. Accordingly, "[a] great deal of discretion must . . . be vested in the trial judge, who is usually best situated to determine the degree of necessity for the declaration of a mistrial when an unexpected event occurs during trial." *Id.* Indeed, the manifest necessity standard is certainly among those "more general" standards, the application of which over time "demand[s] a substantial element of judgment." *Yarborough v. Alvarado*, 124 S.Ct. 2140, 2149 (2004). Accordingly, the deference accorded to state courts' application of the rule in the habeas setting is broader than it would be if a specific rule -- one more susceptible of "plainly correct or incorrect" applications -- were at issue. *Id.*

Here, the trial court determined that a mistrial was warranted because a deliberating juror had possibly suffered a heart attack and would be kept in the hospital for at least two days for tests. The juror became ill on a Wednesday, and therefore would be out at least through the end of the trial week. The court considered, but ultimately rejected, defense counsel's request that prior to declaring a mistrial, it "gather more information about the health

20

and well-being of the juror."[6]  (Tr. at 2.)

        In its order denying Ramchair's motion to dismiss the indictment on double jeopardy grounds, the trial court further explained its rationale for declaring a mistrial:

> An entire day, that is Wednesday, June 12, had passed and the jury was unable to deliberate.  Since the juror was going to be in the hospital at least two more days, the jury would be unable to deliberate Thursday or Friday.  Even if the juror was released in a few days, the possibility that she would have been physically and mentally fit to handle the stress of jury deliberations was tenuous, at best.
>
> . . . .  In addition, it would be virtually impossible to  maintain this juror separate and apart from outside contact and influence while undergoing medical tests in a hospital atmosphere.  It would also be cruel and inhuman to keep her separated from her family under these conditions.

Order Denying Motion to Dismiss, Attias Decl. Ex. E, at 4.

        The trial court was required to consider alternatives to declaring a mistrial.  It made clear, implicitly at the time and explicitly in its subsequent order, that it considered a continuation.  To the extent the problems associated with sequestration factored into the trial court's decision, it might have clarified whether Ramchair would consent to waiver of the sequestration requirement.[7]  *See Dunkerly*, 579 F.2d at 147 (where jurors free to return home, continuance for 7-10 days may have provided a feasible alternative to mistrial).   But the essential facts remain: the trial court was faced with an ill juror who was diagnosed with a possible heart

---

[6]     The alternative the trial court offered Ramchair -- proceeding with 11 jurors instead of 12 (an alternative that Ramchair rejected) -- was in fact impermissible under New York law.  *See* New York Constitution, Article 6, § 18(a); *Stressler v. Hynes*, 169 A.D.2d 750 (2d Dep't 1991).

[7]     At the time of Ramchair's second trial, New York state law required that a jury be sequestered once deliberations commenced.  *See* N.Y. C.P.L. § 310.10.  That requirement was subject to waiver by a defendant.  *See People v. Webb*, 78 N.Y.2d 335, 336 (1991).

attack and who would be hospitalized for at least two days.  Given the strong possibility that the juror would not be able to return at all, the decision to declare a mistrial does not appear to have been an abuse of the court's broad discretion.  It seems even less likely that the state court's determination on appeal that the trial court had acted properly constituted an unreasonable application of clearly established federal law.  Thus, the prospect of habeas relief on this ground appears remote.

> 2.      The Issues Raised by the Prosecutor's Injection of
>          Latimer's Conduct Into the Trial

> > a.      The Unfairness At Ramchair's Trial

In my view, the prosecutor's conduct was both unfair and prejudicial to Ramchair.  Once the prosecutor implied to the jury that Latimer had a different view of the line-up's fairness at the time it occurred than the one he expressed at trial, Ramchair needed Latimer as a witness to dispel that false implication.  Because, in the circumstances, it would have been untenable to permit Latimer to act as both a key defense witness and the defense attorney, his motion for a mistrial should have been granted.

First, the prejudice to Ramchair could hardly be more clear or -- in a case that hinged solely on identification -- more severe.  The robbery occurred at night.  For most of the 15 minutes it occurred, Ramchair was in the back seat of a car the victim was driving.  At the line-up seven weeks later, Ramchair was the only participant bearing a characteristic (Guyanese Indian) that the victim himself described as important.  A hallmark of a due process inquiry into an allegation of unnecessary suggestiveness is whether the suspect has a characteristic not shared by the fillers that matches the description provided by the victim.  *See, e.g.*, *Solomon v. Smith*,

645 F.2d 1179, 1182-84 (2d Cir. 1981).  Thus, Latimer was on solid ground in arguing to the jury that Olek's identification of Ramchair was tainted by a suggestive line-up.  Olek said the man who took his money looked like a Guyanese Indian, and Ramchair was the only Guyanese Indian in the line-up.

Second, by eliciting that Latimer was present and did not object, the prosecutor implied to the jury that Latimer's personal opinion was that the line-up was in fact fair, not tainted.[8]  Indeed, a central flaw in respondent's defense of the conviction is that he contends that Latimer's proffered testimony would have been inadmissible ("defense counsel's personal opinion of the fairness of the line-up fell 'beyond the bounds of acceptable advocacy'" (Respondent's Br. at 23)), yet admits that Latimer's personal opinion is "precisely" what the prosecutor sought to prove circumstantially through Winnick.  In short, the jury heard *the prosecutor's* version of Latimer's "personal opinion," but it was precluded from hearing Latimer's.

Third, the prosecutor's implication was false.  At the very least, that is what Latimer would have said if he were available as a witness to rebut it.  There are sound tactical reasons for defense counsel not to object to a line-up even when he or she thinks the line-up is unfair.  Latimer has stated some of those reasons in an affidavit.  They are wholly consistent with the often-stated maxim that defense counsel at a New York line-up "plays the relatively passive role of an observer."  *People v. Jones*, 2 N.Y.3d 235, 243 (2004) (citing *People v. Hawkins*, 55 N.Y.2d 474, 486 (1982); *People v. Blake*, 35 N.Y.2d 331, 337 (1974).  One such reason is the

---

[8]        There was no other plausible reason to elicit that testimony from Winnick.  Respondent's counsel candidly conceded at oral argument that Latimer's personal opinion "is precisely what was impliedly placed before the jury" by the prosecutor.  (Oral Arg. at 14.)

desire not to forfeit or undermine the right to complain effectively (at a suppression hearing or trial) about the line-up's composition by giving the police a chance to make a minor change and then cast counsel as an architect of the challenged line-up.  New York cases have explicitly recognized that an attorney's silence does *not* necessarily convey a favorable opinion of the line-up.  *People v. Adams*, 455 N.Y.S.2d 616, 90 A.D.2d 1, 11 (1st Dep't 1982) (counsel's strategy may be to "take his chances on the results of the line-up, reserving the option in the event his client [is] identified to challenge the line-up as suggestive").

Fourth, the fact that Latimer might have had sound tactical reasons not to object to the line-up did not get before the jury that convicted Ramchair.  The record of the trial makes that clear, and respondent's counsel conceded as much at oral argument.  (Oral Arg. at 13.)  Thus, the jury was left with the false impression that the very lawyer who was challenging the fairness of the line-up at trial was not being candid with them because he failed to make the same complaint at the time.

Fifth, the prosecutor sandbagged Latimer.  At the previous trial, Winnik did not testify that Latimer failed to object at the line-up.  Indeed, at that trial, Winnik did not even recall who defense counsel at the line-up was.  Latimer had no reason to suspect at the third trial that Winnik would be used by the prosecutor to imply that Latimer's personal opinion at the time was that the line-up was fair.  In analogous circumstances, the Second Circuit has taken a dim view of prosecutors putting defense counsel on the spot at trial.  *See, e.g.*, *United States v. Malpiedi*, 62 F.3d 465, 467 (2d Cir. 1995) (reversing conviction where prosecutor's delay in notifying trial court of defense counsel's conflict "appears not to have been an oversight but the result of the government's desire to use [defense counsel's] prior representation of [a government witness] to

24

its advantage").  If the prosecutor wanted to imply that Latimer had placed his imprimatur on the line-up, she should have told the trial court before the trial began.  Then the court could have addressed the problem.  If it deemed Latimer's silence admissible, it could have either relieved Latimer to make him available as a witness or procured a knowing, intelligent waiver from Ramchair of his right to have Latimer's testimony at trial.

In this regard, respondent's contention (which apparently persuaded the Appellate Division on direct appeal) that *Latimer* should have anticipated the problem is frivolous. Particularly in light of the evidence adduced at the second trial, Latimer had no reason to suspect that his silence at the line-up would suddenly be cast by the prosecutor in the third trial as contrary to Ramchair's defense.  Moreover, the record reveals that Latimer was acutely aware of his ethical responsibilities where the circumstances indicated he might be needed as a defense witness.  At the conclusion of the second trial, Latimer informed the trial court that Ramchair wanted him relieved, and another attorney assigned, so that Latimer would be available as a witness in the third trial.  (Tr. June 12, 1996 at 6.)  As explained to the court when the parties reconvened the following week, the problem was the potential need for Latimer to be available to testify that Ramchair had a speech impediment and was "stuttering like crazy" in the precinct on the day of the line-up.  (Tr. June 17, 1996 at 5.)[9]  The Assistant District Attorney opposed any approach to the problem that would result in Latimer being relieved (*id*.), but the trial court properly recognized that "the defendant has to be satisfied with the defense he wishes to put on. If he says he wants to call Mr. Latimer, he has a right to."  (*Id*.)  The court further told Latimer as

---

[9]      Since Olek testified that the Guyanese person who robbed him did not have a speech impediment, Ramchair offered this evidence to prove misidentification.  (*See* Tr. 514-15.)

follows:  "Now, if you want to testify, if that's your understanding with you and him, it's okay

too.  I'll give you a new lawyer. ...  Just tell me which way you want to go."  (*Id*. at 7.)  The

following day, Latimer informed the court that after consulting with Ramchair, that they had

decided that Latimer would not be relieved.  Rather than have Latimer available as a defense

witness, they would explore the possibility of using a speech therapist to establish Ramchair's

condition.  (Tr. June 18, 1996 at 2.)

   Knowing that she would inject Latimer's personal opinion of the line-up's

fairness into the third trial, the prosecutor should have said so.  That would have enabled the

court, Latimer and Ramchair to engage in precisely the sort of inquiry that was conducted with

respect to Ramchair's claimed speech impediment.

   Sixth, having Latimer testify at Ramchair's trial while continuing to serve as his

counsel, as Latimer first requested when the issue arose, was not a viable option.  Under the New

York Code of Professional Responsibility, a lawyer "shall not act . . . as an advocate on issues of

fact before any tribunal if the lawyer knows or it is obvious that the lawyer ought to be called as a

witness on a significant issue on behalf of the client."  N.Y. Code of Prof'l Responsibility DR 5-

102(a); *cf. Kalina v. Fletcher*, 522 U.S. 118, 130 (1997) ("tradition, as well as the ethics of our

profession, generally instruct counsel to avoid the risks associated with participating as both

advocate and witness in the same proceeding.").  The concerns implicating the so-called

advocate-witness rule are that:

> (1) the lawyer will appear to vouch for his own credibility, (2) the lawyer's
> testimony will put opposing counsel in a difficult position when he has to
> vigorously cross-examine his lawyer adversary and seek to impeach his
> credibility, and (3) there may be an implication that the testifying attorney
> may be distorting the truth as a result of bias in favor of his client.  Most

> important, when one individual assumes the role of both advocate and witness it "[may] so blur[] the line between argument and evidence that the jury's ability to find facts is undermined."

*Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 282-283 (2d Cir. 2004) (quoting *United States v. Arrington*, 867 F.2d 122, 126 (2d Cir. 1989) (brackets in original) (other citations omitted)); *see also* NY Code of Prof'l Responsibility EC 5-9.[10]

Seventh, the only proper response to the prosecutor's injection into the trial of Latimer's personal opinion of the line-up was to grant Latimer's motion for a mistrial.  The prosecutor created the strong impression that Latimer's silence at the line-up connoted his approval of its fairness -- the exact opposite of the principal defense advanced by Latimer at trial.  Ramchair had the right to present testimony to prove a fact that lay persons could not be expected to intuit -- that Latimer's silence was motivated by his tactics as a lawyer, not his satisfaction with the line-up.  The trial court did not endeavor to determine whether Ramchair wished to waive his right to Latimer's testimony.[11]

Finally, the prosecutor's summation on the issue exacerbated the unfairness of her injecting this issue into the trial.  In response to Latimer's summation attacking the fairness of the line-up, the prosecutor argued (1) "[f]irst of all, [bear] in mind that he was present for this lineup.

---

[10] Ethical Consideration 5-9 of the New York Code of Professional Responsibility states: "If a lawyer is both counsel and witness on a significant issue, the lawyer becomes more easily impeachable for interest and thus may be a less effective witness . . . .  An advocate who becomes a witness is in the unseemly and ineffective position of arguing his or her own credibility.  The role of an advocate on issues of fact and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively."

[11] Once the trial court is alerted to a potential conflict, it has an independent duty to inquire into it. *United States v. Kliti*, 156 F.3d at 150, 153 (2d Cir. 1998); *see also Malpiedi*, 62 F.3d at 469; *United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994) ("[T]rial courts have 'an independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment.'") (quoting *Wheat v. United States*, 486 U.S. 153, 161 (1988)).  "If a district court ignores a possible conflict and does not conduct this initial inquiry, reversal of a defendant's conviction is automatic."  *Kliti*, 156 F.3d at 153.

Okay.  Present," *i.e.*, how could it be so unfair if he was there and did not object?; and (2) Latimer was a "racist" making "offensive" arguments that were "insulting" to the jury.  (Tr. 546-47.)  The former comments capitalized on the evidentiary bind in which she had placed Latimer. The latter comments were outrageous.  They were also flatly contradicted by the evidence. Latimer's point was not that "all black people look alike" (Tr. 547), or that all Guyanese Indians look alike; rather, it was that a line-up shown to a victim who has described the perpetrator by reference to a particular ethnicity ought in fairness to include more than one participant of that ethnicity.  That the prosecutor would distort a fair argument into such a hateful one -- and continue to do so in the face of two sustained objections -- is distressing, and it compounded the error committed at Ramchair's trial.

> I am mindful that some New York courts have found that an attorney's failure to object or offer suggestions at a line-up may properly be considered when the fairness of the line-up is later challenged.  *See People v. Foulks*, 533 N.Y.S.2d 619, 143 A.D.2d 1038 (2d Dep't 1988).  But *see People v. Malphurs*, 489 N.Y.S.2d 102, (2d Dep't 1985) (error to admit former counsel's opinion that composition of line-up was fair).  When the issue arises at a suppression hearing, I agree.  In that setting, the factfinder is far more likely than a jury to understand that tactical reasons may explain an attorney's silence, and the setting provides for those reasons to be freely expressed.

> With due respect to the state courts, I question the wisdom of allowing the litigation of a defense attorney's silence during a line-up when the setting is a trial.  As the New York courts have recognized, such silence is intrinsically ambiguous.  An attorney's role is that of a passive observer, but passivity is not *required*.  Sound defense strategy may warrant

intervention at the line-up, or it may counsel in favor of silence.  It strikes me that sussing out the meaning of such silence in a particular case is precisely the sort of minitrial that a federal court would preclude as confusing and unnecessary pursuant to Fed. R. Evid. 403.

In any event, none of the cases in which New York courts have endorsed the consideration an attorney's failure to object involves the issue raised here.  In this case, the same attorney who was present at the line-up was defense counsel at trial.  The prosecutor, without warning and through circumstantial evidence, sought to prove a personal opinion of the defendant's trial counsel that counsel's testimony would flatly reject.  Finally, the defendant was not permitted to refute the prosecutor's evidence in a setting in which the fairness of the line-up was the crucial issue at trial.  The cases cited by respondent are inapposite.

b.      Ramchair's Contentions

Ramchair asserted in his *pro se* petition that once the trial court allowed the prosecutor to elicit from Detective Winnik that Latimer had not objected to the line-up while it was taking place, the court should have allowed Latimer to testify in rebuttal.  Adopting the argument made by his appellate counsel on direct appeal, Ramchair claims on this petition that he had a due process right to present Latimer as a defense witness, and the trial court's refusal to permit Latimer to testify deprived him of that due process right.

Set forth below are discussions of the due process standard, the claim Ramchair exhausted in state court, and the unexhausted claim that I find meritorious.

(i)      Due Process

The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  In presenting such a

29

defense, the right to call witnesses "is a fundamental constitutional right secured by both the

Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the

Fourteenth Amendment."  *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001); *see also*

*Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that

of an accused to present witnesses in his own defense.").  While judges have the latitude to

exclude evidence that is repetitive, only marginally relevant, or that poses an undue risk of

harassment, prejudice, or confusion of the issues, *Crane*, 476 U.S. at 689-90, criminal defendants

have the right to "put before a jury evidence that might influence the determination of guilt."

*Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (internal quotation omitted).

   In determining whether the exclusion of evidence improperly infringed on a

defendant's right to present a complete defense, reviewing courts analyze (1) whether the trial

court's evidentiary ruling was proper; and (2) whether the excluded evidence was material.  *See*

*Wade v. Mantello*, 333 F.3d 51, 58-59 (2d Cir. 2003).  The determinative question for the latter

inquiry is "whether the omitted evidence would have created reasonable doubt."  *Id.* at 58 (citing

*Justice v. Hoke*, 90 F. 3d 43, 47 (2d Cir. 1996); *see also Jones v. Stinson*, 229 F.3d 112 (2d Cir.

2000).

(ii)  The Claim Ramchair Exhausted

   Ramchair's exhausted claim is that he was deprived of due process because

Latimer was not permitted to testify at trial.  The trial court rejected this claim on the ground that

Latimer never requested to withdraw as Ramchair's counsel before trial so that he could be

available as a defense witness.  The Appellate Division adopted that reasoning in affirming the

conviction.

30

The state courts' result may well have been correct because, as discussed above, the advocate witness rule prohibited Latimer from becoming Ramchair's witness while remaining his lawyer at trial.  The state court's reasoning -- that it was Latimer's obligation to anticipate the prosecutor's tactics in the third trial, and the resulting need for Latimer to testify as a defense witness -- is unsupportable.  Defense counsel in New York routinely attend stationhouse line-ups held pursuant to court order, and they routinely go on to represent the identified person at trial. Implicit in the state courts' reasoning is the assertion that whenever such an attorney intends to challenge the fairness of the line-up at trial, he or she must seek to be relieved, at least if the objections to the line-up were not announced at the time it was conducted.  Since, as discussed above, there are sound reasons why objections would not be stated, the trial court's view would result in too many unnecessary withdrawals by defense counsel.[12]

In any event, whatever the state court's reasoning was, it does not appear that its result -- affirming the trial court's refusal to allow Latimer to testify -- was an unreasonable application of federal law.

(iii)    The Claim Ramchair Has Not Exhausted

Latimer's motion for a mistrial stands on different footing.  It should have been granted by the trial court, and its error in denying the motion deprived Ramchair of a fair trial.

---

[12]    The correct approach is to require the prosecutor to apprise the court -- before trial -- of her intention to make a factual issue out of defense counsel's silence at the line-up.  At that stage, the court can first address the admissibility of the evidence.  As discussed above, such evidence might well be deemed to be more confusing and distracting than it is probative.  Such a determination would end the matter, and defense counsel need not withdraw.  Similarly, even if the trial court rules the evidence admissible, the defendant may choose to proceed with the same defense attorney anyway, knowingly relinquishing the right to counsel's testimony.  Again, the need to separate the defendant from counsel of choice could be avoided.  Only if counsel's conduct is admissible and counsel is a necessary witness whose availability the defendant is unwilling or unable to waive should disqualification be necessary.

However, appellate counsel failed to make that argument to the Appellate Division.  By contending only that Latimer should have been permitted to testify, and not that a mistrial should have been declared, counsel failed to present to the state court an argument that, in my view, would have succeeded in getting Ramchair a new trial.

In short, I believe appellate counsel was ineffective, but I am not permitted to grant habeas relief on that ground because it has never been presented to the state court.  And unlike most unexhausted claims, which are procedurally defaulted as well, a claim of ineffective assistance of appellate counsel can be brought at any time via a motion for a writ of error coram nobis in the Appellate Division.  Thus, Ramchair must exhaust the claim in state court.  If he fails to obtain relief there, he may obtain review of the exhausted claim here.

D.      "Stay and Abeyance"

The combination of AEDPA's exhaustion requirement and its one-year statute of limitations poses a risk of unfairness to state prisoners whose federal habeas petitions contain both exhausted and unexhausted claims.  *See Rhines v. Weber*, 125 S.Ct. 1528, 1533 (2005) (AEDPA "dramatically altered the landscape for federal habeas corpus petitions" by preserving the total exhaustion requirement but imposing a one-year limitations period).  If such a "mixed" petition is timely filed but dismissed pursuant to *Rose v. Lundy,* 455 U.S. 509 (1982) after the limitations period has expired, the petitioner would likely get no federal review at all, even of his exhausted claims, because the time bar would preclude refiling after the previously unexhausted claims were exhausted in state court.  *Rhines*, 125 S.Ct. at 1533-34.  This potential for unfairness is exacerbated by the fact that the federal petition itself does not toll the limitations period.  *See Duncan v. Walker*, 533 U.S. 167 (2001).

To ameliorate this risk of unfairness, the Second Circuit, has prescribed a "stay and abeyance" procedure for mixed petitions.  In *Zarvela v. Artuz*, 254 F.3d 374 (2d Cir. 2001), the court held that when a federal court is presented with a mixed petition, the proper course is to dismiss the unexhausted claims and to stay the consideration of the exhausted claims if dismissal of the entire petition could jeopardize its timeliness upon refiling.  *Zarvela*, 254 F.3d at 380 (While a stay to allow petitioners to exhaust in federal court will be "preferable" in "many cases," it "will be the only appropriate course in cases . . . where an outright dismissal could jeopardize the timeliness of a collateral attack.").  However, since the purpose of AEDPA's limitations period is to promote finality, and that purpose could be defeated by a lengthy stay pending further state court litigation, the court further stated that a stay should be conditioned on the petitioner pursuing state court remedies "within a brief interval, normally 30 days, after the stay is entered and returning to federal court within a similarly brief interval, normally 30 days after state court exhaustion is completed."  *Zarvela*, 254 F.3d at 381.

In *Rhines*, the Supreme Court endorsed the "stay and abeyance" procedure and prescribed the following approach to mixed petitions:  (1) a stay should not be granted where the unexhausted claim is meritless; (2) "stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court," *Rhines*, 125 S.Ct. at 1535; (3) a "mixed petition should not be stayed indefinitely," and "district courts should place reasonable time limits on a petitioner's trip to state court and back," *Rhines*, 125 S.Ct. at 1536; and (4) "if a petitioner engages in abusive litigation tactics or intentional delay, the district court should not grant him a stay at all."  *Rhines*, 125 S.Ct. at 1535

33

(citing *Zarvela*, 254 F.3d at 380-81).[13]

Here, I find Ramchair's unexhausted claim of ineffective assistance of appellate counsel to be meritorious.  He has good cause for not having raised it;  there is no reason to expect Ramchair to understand that his appellate counsel should have complained about the failure to grant the mistrial, not the failure to allow Latimer to testify.  I will not stay the petition indefinitely.  As set forth below, time requirements will be imposed upon Ramchair.  In sum, the prerequisites for a stay and abeyance have been met.

CONCLUSION

The exhausted claims in the petition shall be held in abeyance while Ramchair exhausts his ineffective assistance claim in state court.  He must file his motion for a writ of error coram nobis no later than 30 days after the entry of this order.  If relief is not obtained in state court, Ramchair must renew his claim in this Court within 30 days of the termination of the state court proceedings.

So Ordered.


John Gleeson, U.S.D.J.


Dated:  October 26, 2005
          Brooklyn, New York

---

[13]     The foregoing discussion borrows heavily from G. Mehler *et al.*, *Federal Criminal Practice:  A Second Circuit Handbook*, § 19A-4(c)(2) (Matthew Bender 2005).