UNITED STATES DISTRICT COURT                          <u>FOR ONLINE PUBLICATION</u>
EASTERN DISTRICT OF NEW YORK                          <u>ONLY</u>
-------------------------------------------------------------- X
RACKY RAMCHAIR,                              :
                                            :
                          Petitioner,        :
                                            :          <u>MEMORANDUM</u>
              - against -                     :          <u>AND ORDER</u>
                                            :
JAMES CONWAY, Superintendent,                :          04-CV-4241(JG)
Attica Correctional Facility,                :
                                            :
                          Respondent.        :
-------------------------------------------------------------- X

A P P E A R A N C E S:

         FRANK HANDELMAN
                 780 Third Avenue
                 New York, NY 10017
                 Attorney for Petitioner

         ANDREW CUOMO
                 Attorney General
                 State of New York
                 120 Broadway
                 New York, New York 10271
         By:     Roseann B. MacKechnie
                 Deputy Solicitor General
                 Alyson Gill
                 Assistant Attorney General
                 Attorney for Respondent


JOHN GLEESON, United States District Judge:

                          BACKGROUND

         Racky Ramchair seeks habeas relief from his robbery convictions in state court.

His petition has so far produced a decision of this Court, *Ramchair v. Conway*, 2005 U.S. Dist

LEXIS 25852 (E.D.N.Y. Oct. 6, 2005) (*Ramchair I* ), a decision of the New York Court of

Appeals, *People v. Ramchair*, 8 N.Y.3d 313 (2007) (*Ramchair II*), a second opinion of this

Court, *Ramchair v. Conway*, 2008 U.S. Dist. LEXIS 27682 (E.D.N.Y. Apr. 4, 2008)

(*Ramchair III*), and a decision of the United States Court of Appeals for the Second Circuit,

*Ramchair v. Conway*, No. 08-2004-pr,  2009 U.S. App. LEXIS 14131 (2d Cir. June 30, 2009)

(*Ramchair IV*).  Familiarity with those decisions is assumed.

   *Ramchair III* granted Ramchair's petition for a writ of habeas corpus on the

ground of ineffective assistance of appellate counsel.  Specifically, I held that appellate counsel

made a serious mistake that gravely undermined confidence in the outcome of the state-court

proceedings.  The mistake was her failure to seek review of the trial court's denial of Ramchair's

motion for a mistrial.  I ordered the state to grant Ramchair a new trial.

   The Second Circuit vacated that order and remanded for two purposes: (1) to

afford Ramchair's appellate counsel an opportunity to explain her behavior, and specifically to

say whether "there was a strategic reason for not raising the mistrial claim," *Ramchair IV*, at *3;

and (2) to require me "to provide reasons for" ordering a new trial, rather than just a new appeal,

*id* at *4.

   Pursuant to those directions, I conducted an evidentiary hearing on September 30,

2009, at which Ramchair's appellate counsel in the state court testified.  On the same date, I

heard oral argument (having previously received supplemental briefing on the issue) as to the

appropriate remedy in the event I continued in the belief that the writ should be granted.  I then

reserved decision.

   As discussed below, I once again grant the writ.  Appellate counsel's testimony

confirmed that she indeed made a mistake, and she explained the reason for that mistake.

Specifically, counsel failed to appeal the trial court's denial of Ramchair's motion for a mistrial

because she believed – mistakenly – that the issue had not been preserved for appellate review.

As for the appropriate relief, I once again exercise my discretion to order a new trial, rather than merely a new appeal.  Pursuant to the instructions of the Court of Appeals, I set forth below the reasons for that decision.

DISCUSSION

I.    *Was There a Strategic Reason for Not Raising the Mistrial Claim?*

As discussed above, the first instruction the Court of Appeals gave me was to afford Ramchair's appellate counsel an opportunity to explain her behavior, and particularly to explain whether the failure to assert the mistrial claim was supported by strategic reasons. Appellate counsel testified about her preparation of Ramchair's appeal brief, and the reasons for the choices she made in doing so, at the September 30, 2009 hearing.

Set forth below is a brief description of the relevant portions of the record supplied to appellate counsel, followed by a description of the error she made in prosecuting the appeal and the reasons for the error.

A.    *Ramchair's Unfair Trial*

The tortuous procedural path of Ramchair's petition should not obscure the simple, irrefutable fact that his trial more than 12 years ago was fundamentally unfair.  I described that unfairness at length in *Ramchair I* (at *34-46; J.A. 40-44[1]) and summarized it in *Ramchair III* (at *1-4; J.A. 12), so I need not describe it again here.  Based on the evidentiary hearing, however, I make the following additional observations.

Ramchair was present in my courtroom at the hearing.  Observing him personally for the first time placed in even clearer relief the unfairness of the line-up, and the fallacy of the

---

[1]    Citations in the form "J.A. __" are to the parties' Joint Appendix, filed in the Second Circuit on September 8, 2008.

prosecutor's claim, *see Ramchair I*, at \*5 (J.A. 30), that only skin tone, and not ethnicity, matters in determining whether a line-up is suggestive.  Ramchair, a Guyanese Indian, appears South Asian.  The fact that the perpetrator had such physical characteristics was important to the victim.  Tr. 319-20.[2]  Thus, it was hardly surprising (and not very probative) when the victim selected Ramchair from a line-up in which he was the only person who appeared South Asian.  The prosecutor's argument that it did not matter that the fillers in the line-up were three Hispanics and an African-American,[3] as long as their complexion was comparable to Ramchair's, was frivolous.  A victim looking for someone who appears South Asian will not likely identify an Hispanic or an African-American, even if that person's skin tone is similar to the perpetrator's.

Observing Ramchair in my courtroom helped me appreciate more fully why the prosecutor *needed* defense counsel's imprimatur on the line-up at trial.  The prosecution's case hinged entirely on a vigorously disputed one-witness identification.  I have no doubt that a Queens jury would be receptive to Ramchair's defense at trial, *i.e.*, given that the victim was searching the line-up for a Guyanese Indian, he would naturally settle on Ramchair even if Ramchair was not the perpetrator.  Even putting aside the ridiculous fact that at least two of the fillers' faces were smudged with carbon paper, it was obvious that none of them was South Asian.  What could be a more effective answer to that glaring weakness in the prosecution's case than to lead the jury to believe that defense counsel himself had approved the line-up as fair by not objecting to it at the time?

---

[2]    Citations in the form "Tr. __" are to the transcript of the trial in which Ramchair was convicted, his third.

[3]    The fifth filler, whose skin was much darker than all the others', including Ramchair's, was of uncertain ethnicity.

4

B.      *Trial Counsel's Reaction to the Unfairness*

1.      *The Prosecutor's Tactic*

As described in my prior opinions, the prosecutor surprised Ramchair and his defense counsel, Jonathan T. Latimer, III, at Ramchair's third trial.  *See Ramchair III*, at *3-4 (J.A. 12); *Ramchair I*, at *10-11, *37-40 (JA. 32, 41-42).  By eliciting for the first time that Latimer was present at the line-up and failed to object on the ground that it was suggestive, the prosecutor made Latimer a witness against his own client on the central issue in the case: the suggestiveness of the line-up identification of Ramchair seven weeks after the robbery.  The testimony of Detective Winnik implied to the jury that Latimer did not object to the composition of the line-up because Latimer himself thought it was fair.  In fact, Latimer would have testified that there are important tactical reasons why attorneys do not object to line-ups even when they are unfair.  Unfortunately, jurors would not likely intuit those reasons, and indeed a reasonable layperson would expect a lawyer to object to an unfair line-up.  But the New York courts recognize that an attorney in Latimer's position at a line-up must make an important strategic decision, and the decision may well be to keep quiet even if, as in this case, the line-up is unnecessarily and even grossly suggestive.  *See People v. Adams*, 90 A.D.2d 1, 11, 455 N.Y.S.2d 616, 621 (1st Dep't 1982) (counsel's strategy may be to "take his chances on the results of the lineup, reserving the option in the event his client was identified, to challenge the lineup as suggestive at the hearing").

2.      *The Two Options Available to Trial Counsel*

By eliciting from Winnik that Latimer was both present and silent at the line-up, the prosecutor unfairly cast Latimer in the role of witness *against* his client.  Latimer naturally wanted the opportunity to tell the jury that his silence at the line-up was not, in fact, the seal of approval on the line-up the prosecutor suggested it was.  Since Latimer was the only possible witness to his reasons for not objecting, there were two options available to ameliorate the prejudice of the prosecutor's unseemly tactic.  They were dramatically different options.

First, Latimer could testify in the ongoing trial.  He would then be both the lawyer for the defendant and a key witness for the defendant.  The trial would proceed to a conclusion with Latimer in that unusual dual role.

Second, a mistrial could be declared.  In that event, the trial would end immediately, a new trial would be ordered, new counsel would be appointed, and Latimer would then be available as a defense witness in the new trial, unencumbered by the general prohibition on being both an advocate and a witness in the same trial.

Latimer pursued both options.

a.      *Latimer's Request That The Trial Continue With Latimer in Two Key Roles*

Latimer first sought option one.  After his objection to Winnik's testimony about him was overruled, he immediately told the trial judge that the only way to remedy the "totally improper" act of making him a witness against his client was to allow him to testify *for* his client – to tell the jury the "myriad of reasons that I can have" for not objecting to an unfair line-up. *Ramchair I*, at *12 (J.A. 32) (quoting Tr. 344).  He could not have made a better record of that objection, as the quoted material at pages *10 to *15 of *Ramchair I* makes clear. (J.A. 31-35.)

6

The trial judge made it equally clear that he was hostile to Latimer's application. There was no reason for the hostility, for Latimer had been blindsided by the prosecutor's tactic. Latimer had every reason to believe that his conduct at the line-up would not be an issue at the trial; it had not come up at the suppression hearing or at either of the first two trials, and indeed Winnik had testified at the second trial that he could not even remember who represented Ramchair at the line-up.  Still, the trial court's first reaction to Latimer's complaint about the prosecutor's tactic was that he should have expected it prior to trial and moved to be relieved. When Latimer persisted, the trial court said, "Whatever your application is, it's denied."  Tr. 346. After the prosecutor compounded her unfairness by returning to the issue on re-direct, Latimer objected again.  The judge, by then obviously fed up with Latimer, threatened him in the presence of the jury: "Say it again and we will have business together at the end of the trial." Tr. 372.

           b.    *Latimer's Request for a Mistrial*

After Winnik's testimony, and having failed in his effort to testify in the ongoing trial, Latimer sought option two: he moved for a mistrial: "I have a motion for a mistrial.  I think it is completely improper to allow the prosecution to imply through their questioning of this witness that I somehow condoned the line-up and contend that is fair and then not allow me to testify myself or to put on that information in the contrary with respect to that issue."  Tr. 380-81.  The trial court promptly denied the request without explanation.  Had the request been granted, Latimer would have been available to testify at the subsequent trial.

           C.    *Appellate Counsel's Mistake Regarding the Preservation of the Mistrial Claim*

As discussed above, Latimer sought both forms of possible relief from the prosecutor's unfair tactic of converting him into a witness against his client.  Though appellate

counsel fully appreciated the unfairness of the tactic, the brief on appeal on this issue sought review only of the denial of the request to testify; the denial of Latimer's motion for a mistrial was not appealed.

Appellate counsel explained at the hearing that she thought the mistrial claim was not preserved.  Though she was aware that Latimer explicitly moved for a mistrial, she believed that the motion was just another way of complaining about the denial of the request to testify: "I sometimes find with trial attorneys that they think in addition to objecting, they have to move for a mistrial just to kind of make sure they preserve the issue."  H. 46.[4]  Though appellate counsel acknowledged that the denial of the request to testify had already preserved that issue for appellate review, *id.*, she nonetheless concluded that Latimer's mistrial motion was intended only to preserve it further, a "belt-and-suspenders" approach appellate counsel attributes to trial lawyers generally.  The result:  despite the explicit motion for a mistrial and the explicit denial of the motion, appellate counsel chose not to appeal that denial because she thought the issue had been procedurally defaulted.[5]

Appellate counsel was mistaken.  Latimer first sought to testify in the ongoing trial.  The request was denied, and that issue was thus preserved for appellate review.  Having failed to obtain that remedy, Latimer then sought to terminate the trial by moving for a mistrial.  That motion was denied, and thus that separate issue was preserved for appellate review as well.

---

[4]     Citations in the form "H. __" are to the transcript of the September 30, 2009 evidentiary hearing.

[5]     *See, e.g.*, H. 22 ("Q: So, that was [Latimer's] sort [of] unitary request throughout the course of that portion of the trial was that he be permitted to testify during his representation of Mr. Ramchair?  A:  Yes."); H. 40-41 ("Q: … One [remedy] would have been to let Latimer get on the witness stand and provide his testimony … .  Another course would be to have another trial at which Latimer would not be counsel at which he could provide such testimony.  And if I understand you correctly, you believe the latter claim was not sufficiently preserved?  A:  Yes, Your Honor.").

D.      *The Reasons for the Mistake*

The testimony of Ramchair's appellate counsel revealed multiple reasons for her mistaken belief that trial counsel had not preserved the mistrial issue for appellate review.

One is especially unfounded.  Appellate counsel speculated that since Ramchair was already involved in his third trial, Latimer might have decided that it was not in anyone's interest, even Ramchair's, to seek yet a fourth trial.[6]  But the record shows that after Latimer's request to testify was denied, he was adamant about the fact that Ramchair was receiving an unfair trial.  When the prosecutor, on Winnik's re-direct examination, once again used Latimer's silence at the line-up as evidence against his client, Latimer said to the court, "You're allowing that [to go in] uncontradicted and that's not fair."  Tr. 372.  Even after the judge responded by threatening Latimer with sanctions, *id.*, Latimer said, "Judge, it is not fair to Mr. Ramchair.  I am sorry, your Honor it is not fair."  *Id.*  When the judge ordered him to sit down, Latimer added, "I will sit down.  I am not trying to disrespect the court.  I am trying to get a fair trial."  *Id.* at 372-73.

Moments later, the prosecutor completed her re-direct of Winnik by taking full advantage of the untenable position in which she and the trial judge had placed Latimer and Ramchair: *Winnik* could testify about Latimer's conduct at the line-up, prejudicing Ramchair, but Latimer was precluded from testifying about precisely the same events.  The examination concluded as follows:

---

[6]      H. 22-23 ("Q: Would [appointing new counsel for a fourth trial] have created a hardship in this particular case in your view?  A: Well, I thought that Latimer was – Mr. Latimer was primarily arguing for this [*i.e.*, to testify] because this was actually the defendant's third trial.  It seemed like it would be a hardship on everybody, and [not] in the interest of judicial economy to have yet another trial.  Mr. Latimer had represented Mr. Ramchair throughout all these proceedings, so they had an attorney-client relationship.  Bringing in another attorney to get up to speed on all the issues in the case, when Mr. Latimer had been with the case from the very beginning, and might not have understood it[,] might not have been in the defendant's best interests.").

9

Q:     As far as this lineup was put together, when you were present at the lineup and this defense attorney [referring to Latimer] was present at the lineup, did he ever, in any way, shape or manner or form, object to any of the fillers that you had in this lineup?

A:     No, he did not.

Q:     Did he object to the seating of the fillers?

A:     No, he did not.

Q:     Did he object to the specific people that you had chosen as fillers?

A:     No, he didn't.

Q:     Did he object on the basis that their nationality was not necessarily the same as that of the defendant?

A:     No.

Q:     Thank you.

Tr. 373.

Stuck squarely in a situation in which his own conduct was being used in a misleading fashion to the significant detriment of his client and he was prohibited from giving the testimony that would ameliorate the prejudice, Latimer's re-cross-examination reflected both his frustration, *see* Tr. 377 (trial court admonishing Latimer for using a "loud voice"), and his determination to have the opportunity a mistrial would afford him to testify at a fourth trial to contradict the prosecutor's contention that he "somehow condoned the line-up." Tr. 380. On this record, it was not reasonable for appellate counsel to conclude that Latimer had somehow decided, "in the interest of judicial economy," as appellate counsel put it, H. 23, that Ramchair did not need another trial.

Another reason underlying appellate counsel's mistaken belief that the mistrial issue had been defaulted was her equally mistaken belief that the two separate potential claims on appeal, *i.e.*, (a) the trial court erred by not allowing Latimer to testify, and (b) the trial court erred by not granting the mistrial motion, would stand or fall together. As appellate counsel explained her thinking, both arguments would lead to the same result (a new trial), and to prevail

10

on either, "*the Appellate Division was still going to have to address and agree with the issue that the court erred in not allowing counsel to testify*." H. 25 (emphasis added). This was simply incorrect. In fact, the Appellate Division could have concluded that the trial court properly ruled that Latimer could not testify in the ongoing trial, but that it nevertheless erred by not ordering a mistrial so he could testify at a fourth trial. *See Ramchair I*, at *49-50 (J.A. 45-46).

        Appellate counsel believed Latimer should have been permitted to testify at the trial and continue to be Ramchair's advocate as well. She stated at the hearing that "I looked at the Advocate Witness Rule and I looked at the Disciplinary Code, I think that's what it's called," and concluded that "it made sense for counsel to be able to testify in this particular issue." H. 21. Latimer's testimony was "going to be fairly limited," counsel reasoned, and thus it qualified as one of those "narrow instance[s]" in which trial counsel could properly be a witness in the trial. *Id.*

        This was wrong. As discussed in *Ramchair I* (at *49-50; J.A. 45), allowing Latimer to testify at the ongoing trial was not a viable option. The Disciplinary Code stated that a lawyer should not testify on behalf of a client on a "significant issue." N.Y. Code of Prof'l Responsibility DR 5-102(a).[7] Identification was the *sole* issue at Ramchair's trial. The linchpin to the defense was that the impermissibly suggestive line-up produced a tainted identification of Ramchair at both the line-up and the trial. The prosecutor had already injected Latimer's silence at the line-up into the case as evidence that Latimer believed the line-up was fair. Latimer would

---

    [7]    The Code outlined four exceptions to the prohibition on an attorney testifying to a significant issue of fact, none of which applied in Ramchair's case. *See* N.Y. Code of Prof'l Responsibility DR 5-102(a). Latimer's testimony did not relate solely to an uncontested issue, *see id.* DR 5-102(a)(1), to a matter of formality, *see id.* DR 5-102(a)(2), or to the nature or value of the legal services he had performed, *see id.* DR 5-102(a)(3). Nor was Latimer so distinctly valuable that his disqualification would have inflicted a substantial hardship on Ramchair, *see id.* DR 5-102(a)(4). On the contrary, when compared with a trial in which Latimer served solely as a witness, having him play the unseemly dual role of advocate-witness would likely have damaged Ramchair's defense.

11

have testified into the teeth of that factual theory by saying his silence meant nothing of the sort, but rather evidenced a strategy to complain about the obvious defects in the line-up later if indeed the victim identified Ramchair.  As appellate counsel acknowledged at the hearing, *see* H. 41-42, the Assistant District Attorney would have been free to challenge Latimer's testimony by asking him if he was lying about the reasons for his silence in order to save his client and win the case.[8]  As a result, Latimer's credibility would have become, in appellate counsel's understated words, an "important issue" in the case.  H. 42.  In summation, Latimer would have been called upon to argue his own credibility on a key factual issue in the case; the prosecutor would presumably have argued that Latimer was both a racist and a liar.  The blending of Latimer's roles as key witness and advocate for the defendant would have undermined the entire process.  *See* N.Y. Code of Prof'l Responsibility EC 5-9 ("If a lawyer is both counsel and witness on a significant issue, the lawyer becomes more easily impeachable for interest and thus may be a less effective witness. ... An advocate who becomes a witness is in the unseemly and ineffective position of arguing his or her own credibility.  The role of an advocate on issues of fact and of a witness are inconsistent.").

The appellate court could thus easily and reasonably conclude that Latimer was properly precluded from testifying for these reasons.  At the same time, it could reasonably conclude that his separate request for a mistrial had merit.  (In my view, that conclusion was inescapable.)  A mistrial would allow Latimer to seek to be relieved as counsel for Ramchair so he could then be available as a witness in the ensuing retrial.  Ramchair could then have the

---

[8]       There can be no doubt that the Assistant District Attorney would have pursued such a cross-examination.  Compared to her outrageous and illogical claim that Latimer was a racist, *see Ramchair I* at *17-18, *44 (J.A. 35, 43-44), an assertion that he was a liar would have been mild.

12

benefit of the critical testimony of Latimer without imposing on the trial the cost of blurring the roles of advocate and key witness for the defense.

In sum, appellate counsel believed that in order to prevail on appeal on a claim that a mistrial was erroneously denied, the Appellate Division would have had to conclude that Latimer should have been allowed to testify.  This belief was wrong, and it apparently contributed to counsel's failure to seek the relief she should have asked for, which, in my view, the appellate court could not reasonably have denied.

One final word about appellate counsel's hearing testimony is warranted.  As discussed above, despite the fact that Latimer moved for a mistrial and the motion was denied, appellate counsel felt the mistrial motion had not been preserved.  Her testimony included a statement that Latimer "never indicated … *why* he was moving for a mistrial," that is, he never said explicitly he wanted one so he could be relieved as counsel and be available to testify at a fourth trial of his client.  H. 25.  Counsel stated that an appeal from the denial of the mistrial motion would have focused the court on the fact that Latimer did not asked to be relieved.  As confirmation of her thinking, appellate counsel pointed out that the state court in fact focused on Latimer's failure to move to be relieved.  H. 25-26.

This testimony reveals that appellate counsel conflated two distinct issues.  It is true that the state courts focused on Latimer's failure to ask to be relieved, but this focus had nothing to do with the sufficiency of his objection *at trial*.  Rather, the trial judge denied the motion for a mistrial because it believed Latimer should have sought to be relieved before the trial even began:

> It seems to me that the defense attorney was aware before today whether he was going to raise objections to the conduct of the line-up and as to the improprieties which he may have observed when he was there.  Being aware of the necessity to

state those on the record[,] what was improper about it, it seems to me you should have been relieved as an attorney *before you started this trial*.

Tr. 344-45 (emphasis added).[9]

As discussed in *Ramchair I* (at *38-40; J.A. 42), this criticism of Latimer by the state courts was unfair and unfounded. Latimer had in fact demonstrated his keen sensitivity to the ethical problems associated with any need Ramchair might have for his testimony, an issue that Latimer aired fully and appropriately in connection with the issue of Ramchair's speech impediment. The fact that Latimer did not similarly raise the issue of his silence at the line-up before the third trial began had nothing to do with a "failure" on his part and everything to do with prosecutor's decision to keep to herself her desire to blindside Latimer with the issue at trial.

The second issue is the adequacy of Latimer's mistrial motion to preserve the claim that a new trial should have been ordered so that he could give the testimony he was prohibited from giving in the ongoing trial. Appellate counsel's suggestion is that Latimer's request for the declaration of a mistrial was not enough – he needed to add to that request words to the effect that he wanted the mistrial "so when we try the case again I can be available to testify." This suggestion is incorrect. Latimer made perfectly clear that the reason he sought the mistrial was so he could testify for Ramchair in a subsequent trial. Within the two or three minutes before making the motion, Latimer repeatedly told the trial court that he wanted to

---

[9]      The prosecutor made this same argument to the Appellate Division, *see* Brief for Respondent at 25, *People v. Ramchair*, 308 A.D.2d 601, 764 N.Y.S.2d 725 (2d Dep't 2003) (No. 97-4604) (chastising Latimer for failing to withdraw prior to trial if he wanted to testify about the line-up), and that court's statement that Latimer "never requested to withdraw as the defendant's attorney so … he could be the defendant's witness," *People v. Ramchair*, 308 A.D.2d 601, 602, 764 N.Y.S.2d 725, 726-27 (2d Dep't 2003) (citing *People v. Rivera*, 172 A.D.2d 633, 568 N.Y.S.2d 435 (2d Dep't 1991) and *People v. Limongelli*, 156 A.D.2d 473, 548 N.Y.S.2d 759 (2d Dep't 1989)), also focused on Latimer's *pretrial* conduct. The cases cited by the Appellate Division both concern the obligation of a lawyer to withdraw prior to a proceeding if the lawyer learns that he or she ought to available as a witness for the client.

14

testify.[10]  And when he made the mistrial motion itself, he explained that a mistrial was necessary because it was unfair "not to allow me to testify myself" about his silence at the line-up.  Tr. 380.  Thus, there was no ambiguity about the purpose for which the mistrial was sought.

In any event, to preserve the claim on appeal that Ramchair was improperly denied a mistrial because he was deprived of Latimer's critical testimony, Latimer needed only to move for a mistrial for that reason, which he did.  Although it could hardly have been more obvious that, had the mistrial been granted, Latimer would have subsequently sought to be relieved as counsel so he could testify for Ramchair, there was no procedural requirement that he state those plans to preserve the issue for appellate review.  New York law says, *inter alia*, that a challenge to a trial court's ruling "is presented" for appellate review "when a protest" to the ruling is "registered, by the party claiming error, at the time of such ruling …."  N.Y. Crim. Proc. Law § 470.05(2).  Latimer's motion for a mistrial protested the continuation of the trial in light of the prosecutor's surprise (and extremely unfair) use of his silence at the line-up against Ramchair.  Standing alone, the motion and the court's denial of the motion preserved for appellate review the meritorious claim appellate counsel chose not to make.

E.     *Conclusion*

In sum, appellate counsel's decision not to raise the mistrial claim on appeal was founded on her belief that the claim had not been preserved in the trial court.  Appellate counsel herself and the respondent characterize that decision as "strategic."  H. 34.  Because the claim was in fact preserved for appellate review, I find the decision was a mistake.  The testimony at the evidentiary hearing on September 30, 2009 thus confirms my earlier determinations that

---

[10]     Tr. 372 ("I am going to ask to testify."); *id.* ("But, Judge, you're not letting me testify.); *id.* ("You're allowing that [to go] in uncontradicted and that's not fair.").

Ramchair received constitutionally ineffective assistance of counsel on his direct appeal, and that the New York courts' decision to reject Ramchair's *coram nobis* petition involved an unreasonable application of the first prong of *Strickland*. *See Ramchair III*, at *10-15 (J.A. 15-16).

Appellate counsel's deficient performance was, of course, prejudicial under *Strickand*'s second prong. *See Strickland v. Washington*, 466 U.S. 668, 692 (1984) ("any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution"); *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000) (where ineffective assistance of appellate counsel consists of failure to brief issues, petitioner must "show a reasonable probability that … he would have prevailed on appeal"). Had it been confronted with a challenge to denial of a mistrial, the Appellate Division would have been constitutionally compelled to find that Ramchair was deprived of his due process right to a fair trial, and that a new trial was necessary. *See Ramchair I*, at *34 (J.A. 41) ("the prejudice to Ramchair could hardly be more clear or – in a case that hinged solely on identification – more severe"). The decision to deny a new trial allowed Winnik's testimony that Ramchair's attorney had approved the unfair line-up to go unrefuted. The probability that a jury would reach a different result if Latimer were allowed to testify at a new trial is more than "sufficient to undermine confidence in outcome of the proceeding." *See Strickland*, 466 U.S. at 694; *Wilson v. Mazzuca*, 570 F.3d 490, 507 (2d Cir. 2009) (writ granted where counsel's error "immeasurably undermined [petitioner's] mistaken identification defense").

For these reasons, and for the reasons given in *Ramchair I* and *Ramchair III*, I adhere to my initial decision to grant habeas corpus relief.

II.      *The Appropriate Relief*

The second instruction in the Second Circuit's remand is that I explain why a new trial, rather than a new appeal, is the appropriate relief if I conclude, as I do, that Ramchair's appellate counsel was ineffective.

A.      *The Habeas Court's Remedial Discretion*

The habeas corpus statute requires me to "dispose of the matter as law and justice require." 28 U.S.C. § 2243. Under the statute, a federal district court has "the largest power to control and direct the form of judgment to be entered in cases brought up before it on habeas corpus." *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) (internal quotation marks omitted); *see also DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996) (court has "broad discretion in conditioning a judgment granting habeas relief").

The Second Circuit's remand order noted that "the practice on ineffective assistance of appellate counsel claims is generally to grant a new appeal," but also stated that I am "not necessarily precluded from ordering a new trial." *Ramchair IV*, at *3-4. While conceding the "broad discretion allowed in fashioning the judgment granting relief to a habeas petitioner," *Hilton*, 481 U.S. at 775, respondent nevertheless seeks to portray as an unbending rule the general practice of ordering a new appeal where appellate counsel is found to be constitutionally inadequate. In fact, courts have occasionally gone so far as to grant unconditional release in such cases. *See, e.g., Hannon v. Maschner*, 981 F.2d 1142, 1144-45 (10th Cir. 1992); *Ward v. Wolfenbarger*, 340 F. Supp. 2d 773, 776 (E.D. Mich. 2004). In addition, courts addressing ineffective assistance of appellate counsel claims have sometimes ordered a new trial. *See, e.g., Eagle v. Linahan*, 279 F.3d 926, 944 (11th Cir. 2001); *see also Page v. United States*, 884 F.2d 300, 302 (7th Cir. 1989) (ineffective assistance of appellate

17

counsel "may also justify a new trial on occasion"); *Gray v. Swenson*, 302 F. Supp. 1162, 1164 (W.D. Mo. 1969) (rejecting respondent's argument that a new appeal should be ordered to give the state courts a third opportunity to correct their error, and ordering further trial-court proceedings as the remedy for ineffective assistance of appellate counsel).

When selecting among these possible remedies – unconditional release, a new trial, and a new appeal – I am mindful that Sixth Amendment deprivations "are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981).

B.     *Unconditional Release*

Unconditional release with prejudice to reprosecution, the "king of habeas remedies," *see Foxworth v. Maloney*, 515 F.3d 1, 2 (1st Cir. 2008), is appropriate in two general sets of situations.  *See* 2 Randy Hertz & James Liebman, *Federal Habeas Corpus Practice and Procedure* § 33.2.  In the first category, which is not at issue in this case, the very fact of reprosecution would violate the petitioner's constitutional rights.  *See id.*  Perhaps the most obvious example is where further proceedings against the petitioner would violate the Double Jeopardy Clause.  *See, e.g., Corey v. Dist. Ct. of Vermont,* 917 F.2d 88, 92 (2d Cir. 1990).  In the second category, unconditional discharge may be ordered – even though reprosecution itself is not unlawful and the error could theoretically be cured in future state-court proceedings – where the constitutional violation is " 'so egregious, its consequences so grave, and the unlawful restraints already imposed on the petitioner's liberty so lengthy or severe that law and justice mandate unconditional discharge.' " *Garcia v. Portuondo*, 459 F. Supp. 2d 267, 293 (S.D.N.Y. 2006) (quoting 2 Hertz & Liebman, *supra*).

18

Cases involving prolonged and potentially unjustifiable periods of incarceration resulting from ineffective assistance of appellate counsel have sometimes fallen within the second category. *See, e.g., Hannon*, 981 F.2d at 1145 (thirty-three years after the conviction, unconditional release was appropriate because a conditional writ "would not vitiate the prejudice to the petitioner from the denial of direct review"); *Ward*, 340 F. Supp. 2d at 776 ("in light of the prejudice that petitioner would receive from further delays in adjudicating his claims in the state appellate courts" after thirty-three years, a conditional writ would be inappropriate). The circumstances of this case, however troubling, are not sufficiently egregious to warrant Ramchair's release with prejudice to reprosecution. *Cf. United States ex rel. Schuster v. Vincent*, 524 F.2d 153, 154 (2d Cir. 1975) (ordering immediate unconditional release where the State's treatment of petitioner reminded the Court of Solzhenitsyn's *The Gulag Archipelago*).

C.   *New Trial vs. New Appeal*

Because this is not a case where no further proceedings against Ramchair are permissible, the real issue when exercising my discretion to fashion the appropriate relief is whether the writ of habeas corpus should be conditioned on a new appeal, or should instead be conditioned on a new trial.

Arguing that a new appeal is sufficient to cure the violation of Ramchair's constitutional rights, respondent cites four cases where the Second Circuit deemed that particular form of relief an appropriate remedy for ineffective assistance of appellate counsel. *See Claudio v. Scully*, 982 F.2d 798 (2d Cir. 1992); *Simmons v. Reynolds*, 898 F.2d 865 (2d Cir. 1990); *Jenkins v. Coombe*, 821 F.2d 158 (2d Cir. 1987); *Barnes v. Jones*, 665 F.2d 427 (2d Cir. 1981), *rev'd on other grounds*, 463 US. 745 (1983); *see also Mathis v. Hood*, 937 F.2d 790 (2d Cir. 1991). Each of these cases differs from Ramchair's in at least one crucial respect: in none did

19

the Court determine that the petitioner possessed any underlying federal right to a new trial.  *See*

*Claudio*, 982 F.2d at 803-05 (appellate counsel's failure consisted of failure to raise state

constitutional law claim which could not itself provide a basis for federal habeas relief); *Mathis*,

937 F.2d at 795-96 (ineffective assistance justifying a new appeal consisted of conflict of interest

between petitioner and appellate counsel); *Simmons*, 898 F.2d at 868-69 (appellate counsel's

failure consisted solely of excessive delay in prosecuting the appeal; petitioner identified no

underlying constitutional violation at trial); *Jenkins*, 821 F.2d at 161-62 (granting a new appeal,

without passing on the merits of petitioner's underlying claims, because it was "quite possible

that an [effective appellate] attorney would have found other arguments or would have been

more articulate in the presentation of the case on appeal"); *Barnes*, 665 F.2d at 434-36 (finding

appellate counsel ineffective because he failed to brief non-frivolous issues at petitioner's request

and granting a new appeal without requiring a likelihood of success on the merits of those

issues).

Here, by contrast, the ineffective assistance of appellate counsel consists of a

failure to raise on appeal a clear violation of Ramchair's federal constitutional rights at trial.  *See*

*Ramchair I*, at *47-50 (J.A. 44-46).   The Eleventh Circuit's decision in *Eagle v. Linahan*, 279

F.3d 926 (11th Cir. 2001), is more closely analogous to Ramchair's case.  There, the Court

ordered a new trial for ineffective assistance of appellate counsel where counsel's error was a

failure to raise a *Batson* violation on direct appeal.  Because it was "clear that Eagle's *Batson*

claim would have succeeded on appeal," a new state-court appeal would have been a mere

formality, and the Court simply ordered a new trial.  *Id.* at 943-44.  Likewise, the denial of

Ramchair's motion for a mistrial provided unassailable grounds for a new trial under the Due

Process Clause of the Fourteenth Amendment.   In short, contrary to respondent's contention,

granting Ramchair a new trial would not give him more than is necessary to cure the constitutional violations that infected his conviction.

Because I conclude that Ramchair is ultimately entitled to a new trial, and that any other result would be an unreasonable application of clearly established federal constitutional law, the only significant factor weighing in favor of ordering a new appeal is the principle of federalism that underlies habeas corpus review of state court judgments.  The Supreme Court has often referred to "[t]he strong considerations of comity that require giving a state court system that has convicted the defendant the first opportunity to correct its own errors."  *Preiser v. Rodriguez*, 411 U.S. 475, 492 (1973); *see also* Resp.'s Supp'l. Br. 3 (arguing that my decision to grant a new trial "deprived the state courts of their right to correct their own errors").  Specifically, the New York Court of Appeals has not decided the "merits of any issue that could or might have been raised on the original appeal."  *Ramchair II*, at 317 (J.A. 21). Thus, even though I conclude that the denial of Ramchair's mistrial motion deprived him of his due process right to a fair trial, and requires that he be granted a new trial, arguably I should await the New York courts' determination of that precise question.

Weighing in favor of ordering a new trial now is the fact that even though the New York Court of Appeals explicitly did not address the merits of the mistrial issue, its opinion suggests a dim view of those merits.  As respondent's counsel argued in the Second Circuit, the New York courts were fully aware of the concerns I expressed at length in *Ramchair I* and obviously did not share them.  Oral Argument Tr. 2-3, *Ramchair v. Conway* (2d Cir. June 4, 2009) (No. 08-2004-pr).   Indeed, in arguing before me that a new appeal would be more than a formality, respondent has suggested only that appellate counsel in a new appeal could raise *other* claims that might be lurking elsewhere in the record of Ramchair's third trial.  *See* H. 56-58.

21

More importantly, however compelling the need for comity is in the habeas setting as a general matter, I cannot ignore how long Ramchair has had to wait to receive a fair trial.  Indeed, even if he gets all he can reasonably expect from these proceedings – a new trial – it will not be an exaggeration to say that our criminal justice systems have failed Ramchair.  He was sentenced on April 28, 1997.  Though he promptly filed a notice of appeal, more than a year passed before the Appellate Division, on June 18, 1998, deemed the incarcerated Ramchair eligible for appointed counsel and appointed the Legal Aid Society to represent him.  It took the Legal Aid Society almost a year simply to assign the appeal to one of its lawyers.  And she was so busy with other appeals it took her more than three additional years, until May 31, 2002, to file the brief on appeal.  Thus, the simple filing of a brief, the very first step in the effort by court-appointed counsel to obtain judicial relief from an unfair trial, took more than five years.

After the state court appeal process concluded, Ramchair timely filed his petition in this Court on September 20, 2004, more than five years ago.  Though in my view the ineffectiveness of his appellate counsel was (and remains) plain, the respect owed by federal habeas courts to their state counterparts caused me to afford the New York courts an opportunity to address the issue.  That produced my October 26, 2005 decision (*Ramchair I*) staying the petition to allow Ramchair the opportunity to exhaust the ineffective assistance claim in state court.

A year and one-half later, that exhaustion was complete.  The New York Court of Appeals unanimously disagreed with my assessment of appellate counsel's performance, although, as discussed in *Ramchair III* (at *14-15; J.A. 16), its brief opinion suggests a misunderstanding of the "underlying issue" in the appeal.  Playing my own part in delaying justice in this case, I did not issue the writ until April 4, 2008, a full year after the New York

Court of Appeals' decision.  Respondent appealed that decision, producing on June 30, 2009 the order vacating my judgment granting the writ and directing the remand for the inquiry into appellate counsel's thought-processes in briefing the appeal and for an explanation of my reasons for ordering a new trial.

Here we are, more than 12 and one-half years after a trial I believe was so fundamentally unfair that federal habeas relief is warranted.  But even if I am correct in that belief, it is possible that Ramchair could still be several proceedings and even more years away from the relief he seeks.[11]  I have the discretion in these circumstances to bypass at least some of those proceedings – those that would attend an order granting a new appeal – and in my view justice would best be served by exercising that discretion.   Accordingly, I once again order a new trial, not merely a new appeal.[12]

---

[11]     If respondent had his way on the issue of relief, I would grant the writ and order a new appeal.  An appeal to the Second Circuit panel that remanded the case would then follow on the grant of the writ.  If that were affirmed, the petition would be granted and a new appeal ordered (absent Supreme Court review).  Then Ramchair would get his new appeal.  If his conviction is affirmed once again by the New York courts, a new habeas petition would then be filed in this Court and, pursuant to our policy regarding the assignment of such cases, would be assigned to me.  I would then likely grant the writ for the reasons first discussed in *Ramchair I*.  Another appeal to the Second Circuit would no doubt follow.

[12]     I have also considered granting Ramchair a new appeal and ordering him released immediately pending that appeal.  In *Mathis v. Hood*, 937 F.2d 790, 795-96 (2d Cir. 1991), the Second Circuit affirmed the district court's decision to order that form of relief for ineffective assistance of appellate counsel.  In the circumstances of this case, however, release pending appeal would be impractical.   Ramchair is a legal permanent resident of the United States, and is apparently subject to an immigration detainer.  H. 60.  An order that released Ramchair from state custody but left his conviction intact would likely result in him being detained and placed in removal proceedings.

CONCLUSION

This opinion provides the clarification sought by the United States Court of Appeals for the Second Circuit.  For the reasons stated above, I reaffirm my prior decisions (1) that Ramchair is entitled to habeas corpus relief, and (2) that Ramchair is entitled to a new trial rather than to a new appeal.

Pursuant to the remand order, the parties are obligated to notify the Clerk of the Court of Appeals within twenty-one days that I have issued my clarification.  Following the notification, the Court of Appeals' jurisdiction will be automatically restored, and the panel will resume its consideration of respondent's appeal.

So ordered.

John Gleeson, U.S.D.J.

Dated:          November 5, 2009
                Brooklyn, New York